## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF THE DISTRICT OF COLUMBIA

**KENNETH SPRINGS, NATHANIEL**
**REESE, on behalf of themselves and all**      **Case No. 20-cv-3244**
**others similarly situated,**

**c/o Dechert, LLP**
**1900 K Street NW**
**Washington, DC 20006**

       **Plaintiffs,**

        **v.**

**KENNETH J. BRAITHWAITE, Secretary of**
**the Navy, UNITED STATES OF AMERICA,**

**Kenneth J. Braithwaite**
**c/o Robert J. Sander**
**General Counsel of the Navy**
**Naval Litigation Office**
**720 Kennon St., SE, Room 233**
**Washington Navy Yard, DC 20374-5013**

       **Defendants.**

**CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.      Serving in the military exposes men and women to substantial physical and mental challenges and, each year, thousands of service members are injured while on duty. While many of them recover, others do not and, as a result, they may no longer serve in the military because of a disability that rendered them "unfit."

2.      Plaintiffs and the members of the class they represent are former members of the U.S. Navy and Marine Corps who were (a) separated from military service for medical conditions that rendered them unfit for continued military service (hereinafter, "unfitting conditions"), and (b) assigned a combined disability rating for these unfitting conditions that was lower than the combined disability rating required by the relevant statutes and regulations.

3.      This lawsuit is brought to challenge the policy and practice of the Navy that directly led to the unlawfully low combined ratings issued to plaintiffs and the members of the class – to wit, the Navy policy and practice to exclude, when calculating the sailor or Marine's combined disability rating, the individual disability rating(s) assigned by the Department of Veterans Affairs (VA) using the VA Schedule for Rating Disabilities to medical condition(s) that were expressly found by the Navy to contribute to the unfitting condition(s).

4.      The United States Department of the Navy ("Navy"), like other branches of the military, evaluates Navy and Marine Corps service member's medical conditions to determine whether they prevent the service member's continued military service ("fitness") and, if so, to identify the medical conditions that individually or in combination render the Sailor or Marine unfit for continued service.

5.      From April 30, 2002 through June 27, 2019, Navy regulations then in effect required the Navy, after evaluating the effect that a medical condition has on a service member's ability to perform his or her duties, to assign each medical condition to one of four categories:

Category I ("All Unfitting Conditions"); Category II ("Those Conditions That Are Contributing To The Unfitting Condition"); Category III ("Those Conditions That Are Not Separately Unfitting, And Do Not Contribute To The Unfitting Condition"); Category IV ("Conditions Which Do Not Constitute A Physical Disability").

6.     During this period, the Navy was required to assign a "disability rating," from 0% to 100%, to each Category I unfitting condition and Category II contributing condition, assigned by the VA through application of the disability rating criteria set forth in the Department of Veterans Affairs' Veterans Administration Schedule for Rating Disabilities ("VASRD").  Navy regulations required that disability ratings be assigned for only Category I and Category II conditions, as those are conditions that may prevent a service member from performing his or her duties.  Although each medical condition under each of these two Categories was required to be rated separately, these individual ratings were required to be used to calculate a combined disability rating through application of the Combined Ratings Table contained in the VASRD.

7.     The combined disability rating is significant because it triggers certain post-service benefits.  If a service member's combined disability rating is at least 30%, he or she is entitled to disability retirement, and retirement benefits, including military health care for the service member and his or her family.  10 U.S.C. § 1201(a)–(b).  Alternatively, if a service member's combined disability rating is less than 30%, he or she will be medically separated with a one-time lump-sum severance payment and without military health care for the service member and his or her family.  *Id.* § 1203(a)–(b); *see also id.* § 1212.

8.     This case arises from the Navy's failure to assign a disability rating to conditions that fall under Category II, in violation of its own and other regulations in effect during the period from April 30, 2002 through June 27, 2019.  Indeed, in response to a Freedom of

Information Act request, the Navy admitted that not only had it failed to assign a disability rating to any service member's Category II disabilities during this period, but also that "Category II diagnoses do not receive a recorded disability rating percentage, are not recorded in the [Physical Evaluation Board] system of record, and are not combined with Category I disability rating percentages."  FOIA Response to Request DON-NAVY-2020-003338 (Jan. 30, 2020) ("FOIA Response") (Exhibit 1).  As a result, the 16,851 sailors and Marines with at least one Category II condition who were deemed medically unfit to continue to serve between 2002 through 2019 were denied their legal right to a disability rating for each of their Category II conditions, which may have resulted in these service members receiving a lower combined disability rating and fewer benefits than they were entitled to under the applicable statutes and regulations. Unfortunately, veterans have been shortchanged by lowball disability ratings before.[1]

9.       Accordingly, Plaintiff Kenneth Springs, a veteran of the United States Navy, and Plaintiff Nathaniel Reese, a veteran of the United States Marine Corps, and similarly situated veterans of the Navy and Marine Corps bring this action against the United States Department of the Navy, an agency of the United States government, and the Secretary of the Navy (collectively, "Defendants"), to fulfill the duty owed to the Plaintiffs and other veterans.

---

[1] *See Cook v. United States,* 123 Fed. Cl. 277, 300 (2015) (Congress established the Physical Disability Review Board to "eliminate unacceptable discrepancies and improve consistency among disability ratings assigned by the military departments and the Department of Veterans Affairs") (quoting Pub.L. No. 110–181 § 1612(b)(2)(B), 122 Stat. at 422)); *Many Medically Discharged Veterans Missing Out on Rating Upgrade*, MILITARY OFFICERS ASSOCIATION OF AMERICA, https://www.moaa.org/content/publications-and-media/news-articles/2018-military-update/many-medically-discharged-veterans-missing-out-on-rating-upgrade/ (Apr. 30. 2018) ("Congress ordered the PDBR established as part of the 2008 National Defense Authorization Act, after a mountain of evidence surfaced that service branches had been low-balling disability ratings given to thousands of service members medically separated over a nine-year period through recent wars.").

Plaintiffs and the Class seek declaratory and injunctive relief to correct their military records to reflect the combined disability rating they would have received if the individual disability rating(s) assigned to the medical conditions found by the Navy to contribute to their unfitting condition(s) had been included in the calculation of the individual's combined disability rating, as the law required.

## I.      JURISDICTION AND VENUE

10.     Plaintiffs bring this putative class action pursuant to the Administrative Procedure Act, 5 U.S.C. § 701, et seq. ("APA").

11.     This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1331 because this case raises federal questions under the laws governing the United States military and the APA.  10 U.S.C. § 12(b); 5 U.S.C. §§ 701-706.

12.     Plaintiffs seek exclusively declaratory and other equitable relief, including injunctive relief directing Defendants to correct the military records of Plaintiffs and the members of the Class by (a) assigning to each of the medical conditions designated by the Navy as Category II conditions the disability rating proposed by the Department of Veterans Affairs ("VA") through application of the VASRD prior to discharge for all Plaintiffs' and Class Members' Category II conditions, (b) recalculating the veteran's combined disability rating taking into account the disability rating for each Category I and Category II condition, and (c) according disability retirement status in those cases in which the corrected combined disability rating is 30% or higher and replacing the combined disability in those cases of less than 30%.  28 U.S.C. § 2201, 2202, 5 U.S.C. § 702.

13.     The Navy's disability rating determinations constitute final agency action for which there is no other adequate remedy in a court.  *See* 5 U.S.C. § 704.

14.     This Court is the appropriate venue pursuant to 28 U.S.C. § 1391(e) because the Secretary of the Navy is an officer of the United States and because the acts or omissions giving rise to this lawsuit took place in the District of the District of Columbia.  Venue also is proper under 5 U.S.C. § 703 because this is a court of competent jurisdiction.

15.     In accordance with 28 U.S.C. § 2401, this action is brought within six years of the claims arising.

## II.     PARTIES

16.     The Defendants are the United States Department of the Navy, an agency of the United States government, and the Secretary of the Navy.

17.     Plaintiff Kenneth Springs is a veteran of the United States Navy, in which he served for four years until certain medical disabilities rendered him unfit for continued military service. Mr. Springs was assigned a combined disability rating of 20% for bilateral bunion deformity designated as a Category I condition, and discharged from military service.  Although Mr. Springs also suffered from bilateral PES planus deformity (flat feet), which the Navy designated a Category II ("contributing") condition and the VA assigned a 10% disability rating in accordance with the VASRD, the Navy failed to take into account the 10% rating for his bilateral PES planus disability in calculating Mr. Springs's combined disability rating, contrary to 10 U.S.C. § 1216a(b) and Department of Defense ("DoD") and Navy regulations.

18.     Plaintiff Nathaniel Reese is a veteran of the United States Marine Corps, in which he served over seven years until a medical disability rendered him unfit for continued military service.  Mr. Reese was assigned a combined disability rating of 40% for fibromyalgia, which the Navy designated as a Category I condition, and initially was placed on the Temporary Disability Retirement List ("TDRL") due to the unstable nature of his fibromyalgia.  As part of

its fitness decision, the Navy designated Mr. Reese's right shoulder AC pain a Category II condition. Although the VA assigned a 20% disability rating for "right labral tear, superior labral anterior-posterior lesion (slap) and acromiolavicular joint osteoarthritis" and separately assigned a 20% disability rating for impairment of "upper arm humerus, right labral tear, superior labral anterior-posterior lesion (slap) and acromiolavicular joint osteoarthritis" in accordance with the VASRD, the Navy failed to include either 20% rating for his right shoulder pain in calculating Mr. Reese's combined disability rating contrary to 10 U.S.C. § 1216a(b) and Department of Defense ("DoD") and Navy regulations. The Navy subsequently considered whether to take Mr. Reese off the TDRL, and in that proceeding found that Mr. Reese's fibromyalgia was stable and reduced his fibromyalgia disability rating to 20%. While his right shoulder pain was identified as a Category II condition, the Navy did not assign a disability rating for it. With a reduced rating of 20%, Mr. Reese was removed from TDRL and medically discharged with a severance payment.

### III.   FACTUAL ALLEGATIONS

#### A.   Military Disability

19.   Title 10, U.S.C., chapter 61, provides the Secretaries of the Military Departments with authority to retire or separate service members when found to be unfit to perform their military duties because of physical disability, either resulting from injury or illness. The DoD has various directives that provide general guidelines and procedures that must be adhered to by all service branches.[2] In addition, each service branch of the military has its own regulations to comply with the guidelines provided by the DoD.

---

[2] *See* Directive 1332.18 (Separation or retirement for physical disability); Instruction 1332.38 (Physical disability evaluation); and Instruction 1332.39 (Application of the VASRD).

20.     While each military service has established its own procedures for granting a medical discharge, they all follow the same general process called the "Disability Evaluation System" ("DES").   The DES was created by the DoD to provide uniform standards and procedures for the evaluation of a service member's medical condition and the member's ability to continue his or her military service.  Generally, when a service member suffers an injury or illness and it appears the condition may be permanent or one with long-lasting effects that might prevent a service member from returning to duty, the DES is triggered.  Under the DES system, a service member's fitness for duty is evaluated.   A determination is then made whether to authorize a return to duty for a service member who is found fit and able, or to authorize disability separation or retirement for a service member who is found unfit.

21.     Pursuant to 10 U.S.C. § 1216, which directs the Secretary of the Navy to set out regulations  governing disability retirement  determinations,  on  April 30, 2002,  the  Navy published Secretary of the Navy Instruction ("SECNAVINST") 1850.4E.   SECNAVINST 1850.4E replaced then-existing regulations that governed the Navy's disability evaluation system and was in effect from April 30, 2002 until June 27, 2019, when it was superseded by subsequent Navy regulations.

22.     SECNAVINST 1850.4E was promulgated "to operate a system for disability evaluation which makes a single determination of physical fitness to continue naval service, provides for one non-automatic appeal for members found Unfit to continue naval service, assures the rights of the member afforded by law, protects the interests of the government, and eases  transition  to  civilian  life  for  those  found  Unfit  for  continued  naval  service." SECNAVINST 1850.4E, Encl 1. §1003(a).

   B.      **The Navy's Disability Evaluation Process**

23.      The DES procedures under SECNAVINST 1850.4E were the same for both members of the Navy and Marine Corps, and in each case under the authority of the Secretary of the Navy.   SECNAVINST 1850.4E.   The Navy's DES process begins with the Medical Evaluation Board ("MEB").   When a service member is referred to the MEB, he/she submits evidence of his/her condition(s), including medical records, a letter from their commander stating how the conditions affect their ability to do their job, and other records that the MEB may require.   The MEB is comprised of at least two physicians who compile, assess, and evaluate a service member's medical history and current condition to determine whether the service member meets the Navy's retention standards.   If the MEB determines, based on the documentary evidence, that the service member has one or more conditions that cause the member to fall below retention standards, the service member is referred to a Physical Evaluation Board ("PEB") for a fitness determination.

24.      The PEB "is established to act on behalf of the Secretary of the Navy (SECNAV) in making determinations of Fitness to continue naval service, entitlement to benefits, and disposition of service members referred to the PEB.   Excluding any case designated by the Secretary, the President, PEB, acting for the Secretary, shall issue the findings of the PEB." SECNAVINST 1850.4E § 1004(a).   The PEB is a fact-finding board that investigates the nature, cause, degree of severity, and probable permanency of the disability, among other things.   The PEB evaluates the physical condition of the service member against the physical and mental

requirements of his/her particular office, grade, rank or rating, consistent with VA standards.[3]

25.     There are two types of PEB: "Informal" and "Formal."  "The Informal PEB shall screen incoming cases for acceptance and, if accepted, perform the initial disability evaluation on the basis of documentary review of case records."  SECNAVINST 1850.4E, Encl. (4) § 4201. Upon completion of review by an Informal Board, the service member may either accept the preliminary findings, request reconsideration to the PEB President, or demand a Formal PEB. *Id.* at § 4215; *Id.* at § 3102(c).  "A Formal PEB hearing provides an opportunity for the member to present additional material to support his or her case."  *Id.* at § 4301(c).  The function of the Formal PEB is, among other things, to evaluate on the basis of formal hearings attended by the service member "the entitlement of the member to benefits authorized by 10 U.S.C., Chapter 61."  *Id.* at § 4302(b).

26.     If the PEB finds a service member unfit for duty, then it must assign a percentage disability rating from 0% to 100%, in increments of 10%, for each medical condition that "individually or collectively" renders the member unfit, pursuant to the standards established by the VASRD.    SECNAVINST 1850.4E § 3801(b); 10 U.S.C. § 1216a(a).    However, the requirement to rate conditions that individually/collectively render a service member fit comes from 10 U.S.C. § 1216.  Where a service member has more than one such medical condition, the disability ratings are aggregated into a combined disability rating for the service member using the Combined Ratings Table set forth in the VASRD.  The PEB's combined disability rating

---

[3] The Navy recognizes that "Chapter 61 of reference (a) establishes the Department of Veterans Affairs' (DVA) Veterans Administration Schedule for Rating Disabilities (VASRD) as the standard for assigning percentage ratings."  SECNAVINST 1850.4E § 3801(b).

controls the nature of military benefits and services provided to the service member after discharge.

27.     When the PEB determines that a service member is unfit for military service, the service member may be (i) medically separated with a one-time severance payment; (ii) permanently retired with retirement benefits; or (iii) placed on the TDRL if the disability is not of a permanent and stable nature.  The manner in which a member is separated or medically retired is determined by the member's type of disability (i.e., stable or unstable) and the combined disability rating assigned by the Navy.

28.     Service members assigned a combined disability rating of 20% or less are medically separated without the long-term benefits of a disability retirement.  10 U.S.C. § 1203 (medical separation).  Service members assigned a combined disability rating of 30% or more are permanently retired or, if the disability is not determined at the time of assessment to be of a permanent nature and stable, placed on the TDRL for temporary retirement.  10 U.S.C. § 1201 (permanent retirement); 10 U.S.C. § 1202 (TDRL).

29.     A service member placed on the TDRL for temporary retirement must undergo periodic examinations to assess whether the disabilities for which he or she was retired have changed.  10 U.S.C. § 1210(a); SECNAVINST 1850.4E Encl. 3, § 3608.  If the conditions improve enough during TDRL, the PEB may find the conditions are no longer unfitting.  In that case, the service member can choose to either return to full active duty or permanently separate from the military.  If it is determined after a periodic examination that the unfitting conditions are of a permanent nature, the PEB must assign the service member a combined disability rating. As previously noted, service members assigned a combined disability rating of 20% or less are medically separated and service members assigned a combined disability rating of 30% or more

are permanently retired.[4]

30.     A military disability retirement provides monthly retirement payments, the amounts of which may be calculated using a formula that takes into account the service member's combined disability rating.   As a result, a lower disability rating could result in reduced monthly retirement payments.  Disability retirement also provides access to medical care for the former service member, the member's spouse, and the member's children while they remain dependents; access to military bases; commissary privileges; the right to wear military uniforms on appropriate public occasions; travel on military aircraft; and military funeral arrangements and burial privileges in national cemeteries, among other benefits.

31.     If a service member who has not been discharged or separated disagrees with the PEB findings and has exhausted all available options with the PEB, he/she may submit a "Petition For Relief" ("PFR") with the Director, Secretary of the Navy Council of Review Boards.  SECNAVINST 1850.4E, Encl. (2) § 2067; SECNAVINST 1850.4E, Encl. (4) § 4338.

### C.     Category II Conditions

32.     While in effect, SECNAVINST 1850.4E required the PEB to categorize medical conditions as follows:   unfitting conditions ("Category I"); conditions that are not separately unfitting but contribute to an unfitting condition ("Category II"); conditions that are not separately unfitting and do not contribute to an unfitting condition ("Category III"); and

---

[4] During TDRL reevaluation, previous determinations concerning application of any presumption and whether a medical impairment was service incurred or preexisting and aggravated shall be considered administratively final for those conditions for which the member was placed on the TDRL unless there is evidence of fraud; a change of diagnosis that warrants the application of accepted medical principles for a preexisting condition; or correction of error in favor of the member.  *See* SECNAVINST 1850.4E Encl. (3) § 3603.

conditions that do not constitute a physical disability ("Category IV").[5]  The Navy's regulations further required the PEB to assign a disability rating for each Category I and each Category II condition.  *See* SECNAVINST 1850.4E, Encl. 4, § 4111 ("Only Category I and Category II conditions will be rated by the PEB."); Encl. (3) § 3801(a) ("Disabilities determined to be physically unfitting and compensable under reference (c) shall be assigned a percentage rating."); Encl. (3) § 3802(g) ("Disabilities Not Unfitting for Military Service.  Conditions that do not themselves render a service member Unfit for military service will not be considered for determining the compensable disability rating unless those conditions contribute to the finding of unfitness.").

33.     Statutory support for the Navy's regulations requiring assigning disability ratings for conditions that contribute to an unfitting condition (Category II) can be found in 10 U.S.C. § 1216a(b), which provides that "[i]n making a determination of the rating of disability of a member of the armed forces for purposes of this chapter, the Secretary concerned shall take into account all medical conditions, *whether individually or collectively*, that render the member unfit to perform the duties of the member's office, grade, rank, or rating."  (Emphasis added.)

34.     The Navy's regulations requiring assigning disability ratings for conditions that contribute to an unfitting condition is further supported by Department of Defense Instruction ("DoDI") 1332.18, which requires the military disability retirement system to compensate service members for disabilities that "cause or *contribute* to career termination."  DoDI 1332.18, App'x 2 to Encl. 3, ¶ 5(a) (emphasis added); *see also* DoDI 1332.18, App'x 2 to Encl. 3, ¶ 5.1 ("Physical disability evaluation shall include a recommendation or final decision and supporting

---

[5] The superseding regulations, SECNAVINST 1850.4F, do not require the Navy to categorize service members' conditions according to the four categories.

documentation on whether the injury or disease that makes the member unfit *or that contributes to unfitness* was incurred in combat with an enemy of the United States; or was the result of armed conflict; or was caused by an instrumentality of war during a period of war.") (Emphasis added).

**D.    Navy's Failure to Assign Disability Ratings for Category II Conditions**

35.    The policy and practice at issue in this case concerns the Navy's refusal to assign any disability rating at all to Category II conditions, which the Navy defined as secondary conditions that "contribute" to the Category I unfitting condition, while SECNAVINST 1850.4E was in effect.   For example, if the PEB finds that there is one Category I condition and one Category II condition and assigns a 20% disability rating to the Category I unfitting condition and no rating at all to the Category II condition, the service member would have a combined disability rating of 20%.   This policy and practice, of course, makes it much less likely that the combined disability rating would be 30% or more, the threshold for disability retirement.   Even for those service members who receive a combined disability rating of 30% or more for their Category I conditions, the policy and practice of not rating any Category II conditions may result in lower combined disability ratings and fewer retirement benefits than would be the case if disability ratings for the Category II conditions had been taken into account.

36.    The Navy, however, failed to assign a single disability rating for a Category II condition from April 30, 2002 until June 27, 2019, despite clear guidance from SECNAVINST 1850.4E that Category II conditions "will be rated," for the purpose of calculating combined disability ratings for medically separated and retired service members.   (Exhibit 1) FOIA Response.

37.    In addition to violating Navy regulations, the Navy's failure to assign a disability

rating for Category II conditions violates the requirement under 10 U.S.C. § 1216a(b) to rate any medical condition that individually or collectively renders a service member unfit to perform the duties of the member's office, grade, rank, or rating.  Given that the Navy defined a Category II condition as a condition which "contributes" to an unfitting condition, Category II conditions should receive a rating under 10 U.S.C. § 1216a(b) for "collectively" with the Category I condition, rendering a service member unfit.

38.     When read in conjunction with DoDI 1332.18, which provides that the military retirement system "compensate[ ] disabilities when they cause *or contribute* to career termination," it is plain that Category II conditions, which by definition contribute to career termination, should be compensable and thus, rated under the principle of combined effect.  *See* DoDI 1332.18 App'x 2 to Encl. 3, ¶ 5 (emphasis added).

39.     The Navy's policy and practice of failing to assign disability ratings for Category II conditions has harmed affected service members who were deemed not eligible for  disability retirement by depriving them of the benefits associated with a disability military retirement, medical care for the former service member, the member's spouse, and the member's children while they remain dependents; access to military bases; commissary privileges; the right to wear military uniforms on appropriate public occasions; travel on military aircraft; and military funeral arrangements and burial privileges in national cemeteries, among other benefits.  For service members who were granted disability retirement, the Navy's failure to assign a disability rating for Category II conditions resulted in a reduced combined disability rating and potentially reduced retirement benefits.

### E.      Kenneth Springs's Case

#### 1.      Springs's Military Service

40.      Kenneth Springs wanted to join the military since his freshman year in high school.  As a teenager, he joined the Junior Reserve Officer Training Corps program and became the leader of the group's drill team.  In his senior year, Mr. Springs decided to join the Navy.  Mr. Springs enlisted in 2015 with an ultimate goal of becoming a Navy pilot with the Blue Angels and an officer.

41.      After boot camp, Mr. Springs attended training to become an Aviation Ordnanceman, a technician who specializes in servicing, handling and inspecting aircraft weapons and munitions.

42.      After completing training, Mr. Springs was assigned to the U.S.S. Gerald R. Ford, an aircraft carrier located in Norfolk, Virginia.  In 2016, Mr. Springs was promoted to petty officer third class, which required him to supervise junior enlisted personnel.  Due to medical conditions that interfered with his duties while assigned to the U.S.S. Gerald R. Ford, Mr. Springs was placed on limited duty (i.e., the Navy restricted the duties he was permitted to perform).  After undergoing surgery, Mr. Springs was reassigned to Fleet Readiness Center Detachment Norfolk.

43.      Over the course of his service, Mr. Springs received glowing reviews.  In his 2018 Evaluation Report, Mr. Springs's Division Officer described him as: "A CAN DO SAILOR WITH UNLIMITED POTENTIAL.  RECOMMENDED FOR ADVANCEMENT AND RETENTION."  Another review commented that Mr. Springs "is a consummate professional with unlimited potential. Recommended for advancement."   Mr. Springs also received the National Defense Service Medal, Navy Pistol Sharpshooter Ribbon, Global War on Terrorism

Service Medal, and Good Conduct Medal.

### 2.    History of Medical Issues

44.     After enlisting, Mr. Springs began to experience discomfort in his feet due to the boots he was required to wear.  In mid-2016, Mr. Springs's foot pain worsened and he began to observe curvature of his toes.  While assigned to the U.S.S. Gerald R. Ford, he sought treatment from the ship's medical staff and was advised to elevate and ice his feet and take over-the-counter pain medication.  Medical examinations prior to Mr. Springs's enlistment indicated that he had PES planus deformity (flat feet), but the VA later determined that his PES planus deformity with hammer toes "was permanently worsened as a result of service."  He separately was diagnosed with bilateral bunion deformity in October 2016.

45.     On February 27, 2017, Mr. Springs met with a surgeon at Portsmouth Medical Center.  On March 16, 2017, Dr. John Jae Kim performed a medial cuneiform osteotomy with bone graft, as well as a distal chevron osteotomy and an Akin osteotomy of the proximal phalanx of the left hallux.

46.     After this procedure, Mr. Springs had to use crutches and had his foot in air casts. Postoperatively, Mr. Springs was assigned to a forklift training facility and permitted to go home at lunch time because of persistent pain.  However, because the surgical wound did not heal properly, Mr. Springs had pain around the site of the wound and was placed on limited duty in June 2017.

47.     Mr. Springs underwent a second surgery on his left foot on February 1, 2018 to remove the hardware that had been implanted during his first surgery and to correct a bunion, undergoing a closing base wedge osteotomy of the first metatarsal.

48.     Mr. Springs underwent surgery on his right foot, a closing base wedge osteotomy

with bunionectomy on August 23, 2018, also by Dr. Kim at the Naval Medical Center in Portsmouth.

49.     Once again, Mr. Springs did not heal well.  Postoperatively, his feet were pronated so walking caused pain in his ankle and Mr. Springs's hammer toes worsened.  He was unable to receive physical therapy and was exempted from wearing work boots.

### 3.     Denial of Medical Retirement

50.     Mr. Springs began the disability evaluation process with the Navy due to his inability to fulfill the Navy's physical requirements.  On October 4, 2018, the MEB convened to evaluate Mr. Springs's medical conditions.

51.     On January 29, 2019, the MEB found that his flat feet, bunion deformities, and hammer toes interfered with the reasonable performance of his duties and recommended referral of Mr. Springs's case to the PEB for a fitness for duty evaluation.

52.     On April 17, 2019, as part of the DES process, the VA issued proposed disability ratings for all of Mr. Springs's service-connected disabilities.

53.     His proposed DES ratings included a 10% rating for pes planus with hammer toes; 10% for left ankle tendonitis; 10% for right ankle tendonitis; 10% for left foot bunion/hallux deformity status post bunionectomy [andosteotomies]; 10% foot bunion/hallux deformity status post bunionectomy [andosteotomies]; and 10% for lumbosacral strain.  The combined disability rating was proposed to be 50%.

54.     In May 2019, the informal PEB issued findings.  The PEB determined that his right and left bunion deformity was a Category I condition, and that his other conditions were Category III conditions. The PEB assigned a 20% combined disability rating for his bilateral bunion deformities.

55.     Mr. Springs appealed his informal findings and requested a formal hearing.  On June 25, 2019, Mr. Springs appeared at his formal hearing seeking a determination that he was unfit to service on the basis of right and left bunion deformities, pes planus and hammer toes. On July 2019, the formal PEB issued findings that Mr. Springs's right and left bunion deformities were Category I conditions, and assigned Mr. Springs a 20% combined disability rating. The formal PEB also found that his bilateral PES planus deformities were related Category II conditions and his bilateral foot hammer toe deformities were Category III conditions, and in each case did not assign a disability rating for these conditions.  Mr. Springs thereafter filed a petition for relief with the Navy Council of Review Boards.

56.     In August 2019, Mr. Springs's petition for relief was denied by the Navy Council of Review Boards.  Mr. Springs's bilateral deformities remained his sole Category I unfitting conditions and as such, Mr. Springs was due to be medically separated with a 20% combined disability rating.  The Navy Council of Review Boards found Mr. Springs's bilateral pes planus deformities to be Category II conditions and his bilateral hammer toe deformities to be Category III conditions, and in each case did not assign a disability rating for these conditions.

57.     In September 2019, the PEB issued a notification to the Navy of its finding that Mr. Springs was unfit for service and requested that the Chief of Naval Personnel separate Mr. Springs with severance pay and indicated a 20% combined disability rating for Mr. Springs.

    F.      **Nathaniel Reese's Case**

        1.      **Reese's Military Service**

58.     Nathaniel Reese enlisted in the Marine Corps on March 24, 2008.   After graduating boot camp and Marine Corps combat training, he attended military police school and specialized training to become a K-9 (police dog) military police officer.

59.     After completing training, Mr. Reese reported to his first duty station at Marine Corps Air Station Cherry Point in North Carolina to serve as a K-9 military police officer.

60.     Mr. Reese reenlisted upon the completion of his initial enlistment contract in 2012.  Due to limited promotion opportunities within the Marine Corps' military police ranks, Mr. Reese changed jobs within the Marine Corps and attended training in Camp Lejeune, North Carolina to become an air delivery specialist.  Soon after relocating to Camp Lejeune, and due to medical conditions he developed during his active military service, Mr. Reese was disqualified from serving as an air delivery specialist and was assigned to perform administrative work for the remainder of his military service.

61.     Over the course of his service, Mr. Reese received the Navy and Marine Corps Achievement Medal, Marine Corps Good Conduct Medal (twice), National Defense Service Medal, Global War on Terrorism Service Medal, and numerous Certificates of Commendation and Appreciation, among other decorations.

## 2.     Reese's Medical History and Discharge

62.     Before joining the Marine Corps, Mr. Reese had no significant medical conditions.

63.     Around 2010, Mr. Reese began to experience pain and limited mobility in both shoulders, which he attributes to "wear and tear" from working with and restraining dogs during K-9 training and as a military police officer.   While stationed at Cherry Point, Mr. Reese underwent physical therapy and received steroid injections to treat his shoulder pain.  Because these treatments did not adequately treat the pain, in October 2013, he underwent a distal clavicle resection surgery on his right shoulder at Naval Hospital Camp Lejeune.  Since the procedure, he has had limited range of motion in his right shoulder.

64.     On November 14, 2014, a MEB convened at Naval Hospital Camp Lejeune to evaluate Mr. Reese's medical conditions.  The MEB found that Mr. Reese had bilateral acromioclavicular arthrosis involving the shoulder that interfered with reasonable performance of his duties and referred Mr. Reese to the PEB for a fitness evaluation.

65.     On February 25, 2015, the informal PEB issued its preliminary findings that Mr. Reese's right shoulder pain was a Category I unfitting condition and his left shoulder pain was a Category III condition.

66.     As part of the disability evaluation system process, the VA issued proposed disability ratings for all of Mr. Reese's service-connected disabilities, including a 20% rating for Mr. Springs's right labral tear, superior labral anterior-posterior lesion and acromiolavicular joint arthritis and a separate 20% disability rating for impairment of upper arm humerus, right labral tear, superior, labral anterior-posterior lesion and acromiolavicular joint osteoarthritis.

67.     On March 2, 2015, Mr. Reese was diagnosed with fibromyalgia which caused him to experience constant pain, stiffness, and poor mobility.  Fibromyalgia is a medical "condition that causes pain all over the body (also referred to as widespread pain), sleep problems, fatigue, and often emotional and mental distress."[6]

68.     Mr. Reese appealed the informal PEB's preliminary findings, arguing that his newly diagnosed fibromyalgia be deemed an unfitting condition, in addition to his right shoulder pain.

69.     On May 22, 2015, the informal PEB issued revised findings that identified fibromyalgia and left shoulder pain as Category III conditions, but did not assign disability

---

[6] Centers for Disease Control, Fibromyalgia, https://www.cdc.gov/arthritis/basics/fibromyalgia.htm (last accessed Sept. 3, 2020).

ratings for these conditions.  Right shoulder pain remained a Category I unfitting condition.  The PEB assigned a 20% combined disability rating for his right shoulder pain.

70.     On May 27, 2015, the formal PEB held a hearing and found that Mr. Reese's fibromyalgia was an unfitting Category I condition that was "unstable."  The PEB found Mr. Reese's fibromyalgia unfitting because it caused widespread pain that inhibited his "ability to engage in physical training, deployment, watchstanding and sea duty."  The PEB identified right shoulder pain as a Category II condition, but did not assign a disability rating for this condition.

71.     On June 9, 2015, the PEB requested that the VA rate Mr. Reese's newly diagnosed fibromyalgia.

72.     On August 10, 2015, the VA issued a reconsideration of its proposed disability ratings for Mr. Reese's service-connected disabilities.  In the report, the VA recommended that the PEB assign a disability rating of 40% for Mr. Reese's fibromyalgia based on a finding that he had "widespread pain" and that his symptoms were "near constant" and "refractory to therapy."  The VA also proposed a 20% disability rating for right labral tear, superior labral anterior-posterior lesion and acromiolavicular joint arthritis and a separate 20% disability rating for impairment of upper arm humerus, right labral tear, superior, labral anterior-posterior lesion and acromiolavicular joint osteoarthritis.

73.     On August 24, 2015, the formal PEB adopted the VA's recommendation to assign a 40% combined disability rating for Mr. Reese's fibromyalgia, and recommended placement on the TDRL for temporary retirement.  The PEB's findings identified right shoulder pain as a Category II condition, but did not assign a disability rating for this condition.

74.     Mr. Reese was put on the TDRL on November 29, 2015 and temporarily retired

with a 40% disability rating for his fibromyalgia.  Mr. Reese received no rating from the PEB for his right shoulder pain despite it being deemed a Category II condition.

75.     Thereafter, Mr. Reese moved to San Antonio, Texas, expecting periodic examinations to reevaluate his fibromyalgia, per Navy protocol for service members placed on the TDRL with conditions that are not of a permanent or stable nature.

76.     On November 17, 2017, the informal PEB convened to reevaluate his fibromyalgia.  The PEB found that Mr. Reese's fibromyalgia was stable and reduced his disability rating to 20%.  The PEB also identified his right shoulder pain as a Category II condition, but did not assign a disability rating for it.  The PEB found that Mr. Reese's disability was permanent and that he was unfit, and recommended that he be removed from TDRL with severance pay.

77.     On November 2017, Mr. Reese contested the informal PEB's findings and requested a formal hearing.

78.     On January 17, 2018, Mr. Reese appeared before the formal PEB at a hearing. The PEB issued its findings the next day, which were identical to the findings of the PEB convened on November 17, 2017.

79.     Mr. Reese contested the formal PEB findings on February 8, 2018.  On March 26, 2018, Mr. Reese's attorney (Shaka Thorne) submitted a petition for relief to the Director of the Secretary of the Navy Council of Review Boards, arguing that the PEB not reduce Mr. Reese's fibromyalgia rating from 40% to 20% and recognize his right shoulder pain as a separate unfitting condition.

80.     On March 27, 2018, the Director of the Secretary of the Navy Council of Review Boards denied Mr. Reese's petition for relief on the ground that the petition was not submitted

within fifteen days of the formal PEB decision Navy regulations required.  In April 2018, the PEB issued a notification to the Commandant of the Marine Corps of its finding that Mr. Reese was unfit for service and requested that the Commandant separate Mr. Reese with severance pay, indicating a 20% combined disability rating for Mr. Reese.

81.     On March 31, 2018, Mr. Reese was medically separated from the Marine Corps. He was separated with a one-time severance payment, rather than medically retired, and was wrongfully denied benefits associated with a military retirement.

**G.     Navy's Refusal To Recognize Category II**

82.     In response to FOIA requests, the Navy admitted that the number of cases in which Category II conditions received a disability rating between April 30, 2002 and June 27, 2019 was "Zero for all periods" because "Category II diagnoses do not receive a recorded disability rating percentage, are not recorded in the PEB system of record, and are not combined with Category I Disability rating percentages."  (Exhibit 1) FOIA Response.

83.     The Navy's response thus affirms that for over 15 years, the Navy PEB never assigned a disability rating to Category II conditions, and thereby unlawfully treated Category II conditions no differently than Category III conditions, which by definition are not unfitting and have absolutely no nexus to the recorded Category I condition(s).

84.     The Navy further reported that it medically discharged 16,851 sailors and Marines with at least one Category II condition over the last six years.[7]  4,364 of these 16,851 veterans were medically separated with a combined disability rating of less than 30%, and were therefore denied disability retirement.  If the Navy had assigned a disability rating to the Category II

---

[7] Six years is the applicable statute of limitations for a federal court challenge to the Navy's practice.  28 U.S.C. § 2401.

medical conditions to each of these 4,364 veterans, as the law requires, those that had a combined disability rating of at least 30%, would have been entitled to the full array of military disability retirement benefits.

85.     The Navy reported that the remaining 12,487 of these 16,851 veterans were provided a disability retirement because their combined disability was at least 30%—even without the benefit of a disability rating for their Category II conditions.  Nonetheless, the Navy policy shortchanged some of these 12,487 former sailors or Marines because (1) their combined disability ratings may have been higher if their Category II conditions had been assigned a disability rating, and (2) a higher combined disability rating may increase the disability retirement benefits to which the retiree is entitled.

### IV.     CLASS ACTION ALLEGATIONS

86.     Plaintiffs Springs and Reese bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a class of similarly situated individuals.

87.     Plaintiffs Springs and Reese seek to represent a class of all veterans of the United States Navy and Marine Corps whom the Defendants retired or separated for disability six years prior to the filing of this action, whose PEB findings included at least one Category II condition.

88.     This action has been brought and may properly be maintained as a class action under Federal law.   It satisfies the numerosity, commonality, typicality, and adequacy requirements for maintaining a class action under Fed. R. Civ. P. 23(a).

89.     Joinder is impracticable because the Class is numerous.

90.     On information and belief, there are at least 16,851 people in the proposed Class, and the class members are identifiable using the records maintained in the ordinary course of business by Defendants.

91.     Common questions of law and fact exist as to all members of the proposed Class:

a)  whether the Navy's failure to rate Category II conditions and account for them when determining service members' combined disability ratings violated 10 U.S.C. § 1216a(b), SECNAVINST 1850.4E and DoDI 1332.18; and

b)  whether the Navy's decision not to assign a disability rating to each Category II condition was arbitrary and capricious in light of the Navy regulations, as reflected in SECNAVINST 1850.4E, to rate Category II conditions.

92.   Plaintiffs' claims are typical of the members of the Class because Plaintiffs and all class members are injured by the same wrongful acts, omissions, policies and practices of Defendants as described in this Complaint.  Plaintiffs' claims arise from the same policies, practices, and course of conduct that give rise to the claims of the class members, and are based on the same legal theories.

93.   Plaintiffs Springs and Reese have the requisite personal interest in the outcome of this action and will fairly and adequately protect the interests of the class.  They have no interests adverse to the interests of the proposed Class.  They retained *pro bono* counsel with experience and success in class action and veterans' matters.  Counsel for Plaintiffs know of no conflicts among members of the Class or between counsel and members of the Class.

94.   Defendants have acted on grounds generally applicable to all members of the Class, and this action seeks declaratory and injunctive relief.  Plaintiffs therefore seek class certification under Rule 23(b)(2).

95.   In the alternative, the requirements of Rule 23(b)(1) are satisfied, because prosecuting separate actions would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of contact for the party opposing the proposed Class.

## V.        CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### Violation of 10 U.S.C. § 1216a(b)

96.      Plaintiffs reallege and incorporate here paragraphs 1-95.

97.      10 U.S.C. § 1216a(b) provides that "[i]n making a determination of the rating of disability of a member of the armed forces for purposes of this chapter, the Secretary concerned shall take into account all medical conditions, whether individually or collectively, that render the member unfit to perform the duties of the member's office, grade, rank, or rating."

98.      Because the Navy defines Category II conditions as a condition which "contributes" to the unfitting condition, under 10 U.S.C. § 1216a(b) these Category II conditions should receive a rating due to the Category II condition "collectively" rendering the member unfit.  The Navy's failure to rate Category II conditions was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or "unsupported by substantial evidence."  5 U.S.C. § 706.

### SECOND CLAIM FOR RELIEF

### Violation of SECNAVINST 1850.4E

99.      Plaintiffs reallege and incorporate here paragraphs 1-98.

100.     While in effect, SECNAVINST 1850.4E required the PEB to identify and rate Category II conditions.

101.     The Navy must therefore rate all Category II conditions that were identified by the PEB during the period in which SECNAVINST 1850.4E was in effect.

102.     The Navy's practice and the PEB's refusal to rate Category II despite the Navy's regulations, as reflected in SECNAVINST 1850.4E, to rate these conditions was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or "unsupported

27

by substantial evidence."  5 U.S.C. § 706.

## THIRD CLAIM FOR RELIEF

### Violation of DoDI 1332.18

103.    Plaintiffs reallege and incorporate here paragraphs 1-102.

104.    DoDI 1332.18(3)(e) requires the military disability retirement system to "consider all medical conditions, whether individually or collectively, that render the Service member unfit to perform the duties of the member's office, grade, rank, or rating."

105.    DoDI 1332.18(5)(a) requires the military disability retirement system to compensate service members for disabilities that "cause or contribute to career termination."

106.    Because Category II conditions are conditions that "contribute" to an unfitting condition, Category II conditions contribute to career termination.  Accordingly, the Navy must assign disability ratings to service members who have been diagnosed with Category II conditions and provide any benefits that flow from the new disability rating.

107.    The PEB's refusal to rate Category II despite the Navy's regulations, as reflected in DoDI 1332.18(3)(e) and DoDI 1332.18(5)(a), to rate these conditions was "arbitrary, capricious, an abuse of discretion . . . otherwise not in accordance with law" and/or "unsupported by substantial evidence."  5 U.S.C. §§ 701-706.

## VI.        REQUEST FOR RELIEF

108.    Plaintiffs and the class they represent have no adequate remedy at law to redress the wrongs suffered as set forth in this Complaint.  Plaintiffs have suffered and will continue to suffer irreparable injury as a result of the unlawful acts, omissions, policies and practices of the Defendants, as alleged herein, unless Plaintiffs and the classes they represent are granted the relief they request.

109.    WHEREFORE, Plaintiffs Springs and Reese and Class Members respectfully request that the Court order the following:

a)    Certification of this Complaint as a Class Action;

b)    Designation of Mr. Springs and Mr. Reese as the representatives of the Class;

c)    Designation of Plaintiffs' Counsel of Record as Class Counsel;

d)    A declaration that Defendants actions have violated 10 U.S.C. § 1216a(b), DoDI 1332.18 and SECNAVINST 1850.4E;

e)    Injunctive relief requiring Defendants to correct the military records of Plaintiffs and the members of the Class by (a) assigning the VA proposed rating at the time of discharge for all Plaintiffs' and Class Members' Category II conditions, (b) recalculating the veteran's combined disability rating under the VASRD by taking these disability ratings for Category II conditions into account, and (c) according disability retirement status in those cases in which the corrected combined disability rating is 30% or higher and replaces a combined disability rating of less than 30%;

f)    An award of Plaintiffs' attorney fees and costs;

g)    Retain jurisdiction of this case until Defendants have fully complied with the orders of this Court; and

h)    Award such other and further relief this Court deems just and appropriate.

Respectfully submitted this 10th day of November, 2020

**DECHERT, LLP**

By:   /s/ Christina Sarchio

    Christina Guerola Sarchio (456254)
    Peter Larson (219418)
    1900 K Street NW
    Washington, DC 20006

    Brittany Zoll *(pro hac vice)*\*
    Cira Centre
    2929 Arch Street
    Philadelphia, Pennsylvania 19104

    Danielle Gentin Stock *(pro hac vice)*\*
    Jenna Newmark *(pro hac vice)*\*
    Three Bryant Park
    1095 Avenue of the Americas
    New York, New York 10036

    Phillip Garber *(pro hac vice)*\*
    1 Bush Street #1600
    San Francisco, CA 94104

    *Attorneys for Plaintiffs*

    *\*Pro Hac Vice to be submitted*